[Cite as *Brown v. Bob Evans Farms, Inc.*, 190 Ohio App.3d 837, 2010-Ohio-6011.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| BROWN, | ) | |
| | ) | CASE NO.   10 CO 8 |
| APPELLANT, | ) | |
| | ) | |
| v. | ) | O P I N I O N |
| | ) | |
| BOB EVANS FARMS, INC., et al., | ) | |
| | ) | |
| APPELLEES. | ) | |

CHARACTER OF PROCEEDINGS:     Civil Appeal from Common Pleas Court,
Case No. 09CV520.

JUDGMENT:                        Affirmed.

APPEARANCES:

Nicholas Barborak, for appellant.

Richard Cordray, Attorney General, and Susan Sheffield, Assistant Attorney General; and Chris North and Yolanda Vorys, for appellees.

JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Cheryl L. Waite

Dated:  December 3, 2010

VUKOVICH, Presiding Judge.

{¶ 1}  Plaintiff-appellant, Jason Brown, appeals the decision of the Columbiana County Common Pleas Court that upheld the decision of a hearing officer from the Unemployment Compensation Review Commission that denied him unemployment

benefits. That denial of benefits stemmed from a conclusion that defendant-appellee Bob Evans Farms, Inc., had just cause to terminate Brown as a result of his act of locking the doors to the restaurant prior to closing time. For the following reasons, the judgment of the trial court is affirmed.

## STATEMENT OF THE CASE

{¶ 2} Brown began working at the Salem Bob Evans restaurant in July 2004 and later became an assistant general manager. On September 25, 2008, the general manager told Brown that he was being terminated for locking the doors too early on September 15, 2008. Brown then took the offer to resign in lieu of termination. Unemployment benefits were initially granted. However, Bob Evans appealed, eventually receiving a telephone hearing, which was conducted by a commission hearing officer.

{¶ 3} The general manager testified that on September 15, 2008, the city of Salem suffered a power outage. Because Bob Evans was one of the few businesses in town with power and because many residences lost power, it was very busy and was the only place for various customers to eat that night. The general manager stated that he personally received three customer complaints and reports from employees (who had also received complaints) that Brown had locked the doors to the restaurant two times prior to the 10:00 p.m. closing time. He noted that the doors cannot be locked until 10:00 p.m. and that customers who enter before that time can still order and stay to eat.

{¶ 4} From his investigation, the general manager estimated that the doors were first locked around 9:00 p.m., when a customer stepped out to smoke a cigarette and

2

could not reenter. Then, a group of customers tried to enter between 9:20 and 9:30 p.m., but could not get in. The general manager also pointed out that the sales records show that there were no sales after 9:21 p.m. He estimated that the lost revenues were "easily a couple hundred dollars" during that time period. He stated that customers were livid about the locked doors.

{¶ 5} When the general manager first approached Brown about the allegations, Brown denied that he had locked the doors. Upon further questioning, Brown admitted that he had "briefly" locked them. When initially asked how the night went, Brown did not mention that they ran out of food, and when he presented this as an excuse later, he claimed that they ran out of only roast beef and brown gravy. The general manager stated that his interviews with employees showed that it was a busy night, but no one felt that they could not handle the job. He noted that they ran out of hot items on a daily basis and that this meant merely that items would take longer to prepare.

{¶ 6} The general manager noted that the prior night, when some power outages were also occurring and other businesses were shutting down, Brown called him and asked him whether they could close early, to which the general manager responded that they would not close because it would work to their financial benefit that they were the only restaurant open. He pointed out that this phone call shows that Brown knew that he had to ask before closing the store early. He also pointed out that the area director had advised them to expect higher-than-usual sales due to weather and to make sure that the store was staffed up and ready to go for the night; however, in his opinion, appellant did not do so.

**{¶ 7}** Bob Evans submitted the company handbook, which states that management employees can be terminated for engaging in conduct that reflects adversely upon the company. Bob Evans also presented two prior written warnings received and signed by Brown. The first one showed that on April 28, 2005, Brown was reprimanded for locking the doors early, which had been discovered after a customer complained that he arrived 15 minutes prior to closing to find the doors locked. The warning stated that locking the doors even a minute early is a violation of company policy and would result in termination.

**{¶ 8}** The second warning, of November 27, 2006, was issued after an area director arrived at the store 15 minutes prior to closing and saw a vacuum cleaner out front, chairs turned upside down on top of tables, and the pie case closed, giving the restaurant the appearance of being closed. It was pointed out that there were four tables of customers dining at the time. The warning stated, "[W]e lock the doors at 10:00 p.m. and we close the restaurant after the last customer leaves." The warning also advised that this would be Brown's final warning and that if he chose not to follow company directions in the future, he would be immediately terminated. The warning pointed out that there had been many prior conversations and meetings on keeping an open appearance.

**{¶ 9}** An assistant manager then testified that he spoke to a customer who could not get in the restaurant due to the doors being locked early. When he asked Brown about it, Brown told him that he locked the doors for a minute because he was overwhelmed. A server testified that when she worked the next morning, customers from the prior night told that her the door was locked in their faces before closing time.

4

A server who was working on the night in question testified that the hostess told her that the doors had been locked.

{¶ 10} Yet another server testified that between 9:00 and 9:10 p.m., a regular customer had to bang on the door to get back in after exiting briefly and that he had a line of people behind him. She let them in and asked Brown why the doors were locked, to which he responded that he did not want to be there until 11:30 at night. Brown then unlocked the doors, but he relocked them again at approximately 9:20 p.m. This server noted that when she went outside to smoke at 9:30 p.m., she had to be let back in the locked front door by the hostess.

{¶ 11} A cook testified that she heard the hostess telling a couple that they were not seating anymore. The cook contradicted the hostess, found seats for the couple, and informed a server of their presence. She then heard the hostess talking about the doors being locked. The cook agreed that the steam table was running out of prepared food; and thus food preparation, which normally takes no longer than 12 minutes, was taking 20 to 30 minutes. On redirect, the general manager noted that there are often times when this happens.

{¶ 12} Brown testified that they were really busy and running out of items on the steam table so that the prep area had to work harder. He said that the servers were not doing well at suggesting alternative items to the customers. He said that he eventually locked the doors one time for "a brief moment," thought better of it while standing there, and then unlocked them. He acknowledged that locking the doors early was a violation of company policy and that he was required to clear such a decision with the general manager or the area director.

5

**{¶ 13}** On March 19, 2009, the hearing officer reversed the allowance of unemployment benefits and found that Brown had been discharged for just cause. The decision stated that Brown had locked the doors prior to the scheduled closing time, which he knew was in violation of company policy and which was contrary to the company's best interests because customers were prevented from entering during regular business hours. Brown sought review by the full commission; however, the commission disallowed the request for review.

**{¶ 14}** He then appealed to the trial court under R.C. 4141.282, and the parties submitted briefs to the court. On January 25, 2010, the trial court issued a decision affirming the decision of the hearing officer. The within timely appeal followed.

ASSIGNMENT OF ERROR

**{¶ 15}** Appellant's sole assignment of error provides:

**{¶ 16}** "The trial court erred in affirming the review commission's decision in that it was unlawful, unreasonable, and against the manifest weight of the evidence."

**{¶ 17}** Unemployment compensation is not available to an employee who quit work without just cause or who was discharged for just cause. R.C. 4141.29(D)(2)(a). Just cause in this context is that which, to an ordinarily intelligent person, is a justifiable reason for terminating an employee or for an employee's act of quitting. *Irvine v. Unemp. Comp. Bd. of Rev.* (1985), 19 Ohio St.3d 15, 17, 482 N.E.2d 587. "If an employer has been reasonable in finding fault on behalf of an employee, then the employer may terminate the employee with just cause." *Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Servs.* (1995), 73 Ohio St.3d 694, 698. " 'The critical issue is not whether an employee has technically violated some company rule, but * * * whether the

6

employee, by his actions, [has] demonstrated an unreasonable disregard for his employer's best interests.' " *Manor W. Health Care & Retirement Ctr. v. Ohio Bur. of Emp. Servs.* (Dec. 23, 1994), 7th Dist. No. 93CA95, 1994 WL 718785, *2, quoting *Kiikka v. Ohio Bur. of Emp. Servs.* (1985), 21 Ohio App.3d 168, 169.

{¶ 18} A reviewing court can reverse the Unemployment Compensation Review Commission's decision regarding whether a termination was with just cause only if it is unlawful, unreasonable, or against the manifest weight of the evidence. *Geretz v. Ohio Dept. of Job & Family Servs.*, 114 Ohio St.3d 89, 2007-Ohio-2941, ¶10, citing *Tzangas* at 697. See also R.C. 4141.282(H). Because we apply the same standard as the trial court, we are technically reviewing the decision of the commission rather than the decision of the trial court. See id.

{¶ 19} The question of just cause is dependent upon the unique facts of each particular case. *Irvine*, 19 Ohio St.3d at 17-18, 482 N.E.2d 587. Questions of fact are primarily for the trier of fact; in this case, the hearing officer. See id. Our power of review is limited to determining whether the hearing officer's decision was supported by the evidence in the record, and we are not permitted to make factual findings or to determine the credibility of witnesses as long as reasonable minds can reach different conclusions. Id. at 18.

{¶ 20} Here, appellant admitted that he locked the doors early, in violation of company policy, and that he should have called a supervisor before doing so. He even did so the prior evening when his request was denied with the explanation that if the restaurant was the only one open, it would do great business. Warning letters show prior disciplinary actions against appellant for locking doors and otherwise making

7

customers feel that they were not welcome near closing time. Prior meetings and communications focused on the issue of the importance of looking open during all business hours.

{¶ 21} Taking 20 to 30 minutes per order instead of the usual 12 minutes was reported to be an unfortunate but not a closing-worthy event. It was also reported that running out of preheated food was normal during busy periods, and the only item that could not be prepared that night due to its being frozen solid was the roast beef with gravy. The cook and servers testified that they could handle the situation.

{¶ 22} Appellant states that the seconds the doors were locked did not affect the business. However, just because appellant testified that the doors were locked for only a "brief moment" does not make it true. In fact, he initially lied to his supervisor about whether they had been locked at all. Witnesses testified that the doors were locked for more than a brief moment. Testimony established that the doors were locked two separate times, both times for longer than a moment. After one of the lockings, customers entered only because a server let them in, not because appellant changed his mind while standing by the door as he claims. In addition, appellant disclosed to a server that he had locked the doors because he did not want to have to stay late that night.

{¶ 23} Customers reported the next day that they were not just delayed but that some actually left due to the locked doors. Furthermore, the sales receipts show that no sales were made after 9:21 p.m., even though closing time was not scheduled to be until 10:00 p.m. and even though customers are permitted to order thereafter as long as they entered prior to 10:00 p.m. The general manager estimated that they lost at least a

couple hundred dollars in revenue. They also suffered a loss of goodwill. Customers were reportedly livid about being turned away or locked out, especially those customers with no power at home.

{¶ 24} Appellant also complains about the fact that hearsay was presented. For instance, no customers actually testified. However, R.C. 4141.281(C)(2) provides:

{¶ 25} "In conducting hearings, all hearing officers shall control the conduct of the hearing, exclude irrelevant or cumulative evidence, and give weight to the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of serious affairs. Hearing officers have an affirmative duty to question parties and witnesses in order to ascertain the relevant facts and to fully and fairly develop the record. Hearing officers are not bound by common law or statutory rules of evidence or by technical or formal rules of procedure."

{¶ 26} Hearsay was thus a permissible form of evidence at the hearing. Id. See also *Bulatko v. Ohio Dept. of Job & Family Servs.*, 7th Dist. No. 07MA124, 2008-Ohio-1061, ¶11; *Guy v. Steubenville* (2002), 147 Ohio App.3d 142, 149. Customer complaints are common pieces of evidence at an unemployment-compensation hearing regardless of whether each customer is identifiable or called to testify, at least when the incident is confirmed through other evidence and adequate investigation. Thus, this argument is without merit.

{¶ 27} In conclusion, the hearing officer was the trier of fact, whose function was to judge the credibility of witnesses and the weight of the evidence. The hearing officer could reasonably find that appellant had acted contrary to his employer's best interests and caused financial harm and harm to their reputation by his acts, which he knew to be

9

in violation of company rules, and when he had been previously disciplined for violating those rules.

{¶ 28} For the foregoing reasons, the judgment of the trial court is hereby affirmed.

Judgment affirmed.

DONOFRIO and WAITE, JJ., concur.